UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

GARY  GOODMAN,                    )
                                  )
              Plaintiff,          )
                                  )
       vs.                        )
                                  )        No. 1:11-cv-00464-SEB-TAB
YRC, INC.,                        )
                                  )
              Defendant.          )

**ORDER ON PENDING MOTIONS**

This cause is before the Court on Defendant's Motion for Summary Judgment [Docket No. 39], filed on March 6, 2012, and Defendant's Motion to Strike [Docket No. 49], filed on May 7, 2012.  Plaintiff, Gary Goodman, brings this claim against his former employer, Defendant YRC, Inc. ("YRC"), alleging that YRC terminated him because of his age (62) and disability, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., as amended by the ADA Amendments Act of 2008 ("ADAAA"), respectively.  For the reasons detailed below, we <u>DENY</u> Defendant's Motion to Strike and <u>GRANT</u> Defendant's Motion for Summary Judgment.

**<u>Factual Background</u>**

**General Background**

YRC is a less-than-truckload motor carrier providing transportation services in the two-day and longer national and international freight transportation markets.  Utilizing a network of terminal facilities, YRC transports freight by truck throughout North America.  In order to

service the tractors and equipment used to move freight, YRC maintains Equipment Service Centers ("ESC") throughout the country, including one located at 1818 South High School Road, Indianapolis, Indiana ("Indianapolis Service Center").

YRC maintains non-discriminatory employment policies and practices that specifically prohibit any form of discrimination in the workplace. The policies provide equal employment opportunities on the basis of individual qualifications without regard to sex, race, color, age, religion, creed, national origin, veteran status or disability in connection with hiring, tenure, advancement opportunities, and terms, conditions, and privileges of employment.

In 1997, Mr. Goodman was hired[1] as an Equipment Service Center Supervisor ("ESC Supervisor") at the Indianapolis Service Center and remained in that position throughout his employment with YRC. At the time of his hire, Mr. Goodman was 49-years-old. As an ESC Supervisor, Mr. Goodman was primarily responsible for ensuring that YRC's equipment, including tractors, trailers, and converters, was serviced in an efficient manner. He along with the other ESC Supervisors used computer programs to coordinate the performance of maintenance of all equipment and to ensure timely and effective monitoring, maintenance, and compliance with all safety and work rules, policies, and procedures.

At all times relevant to this litigation, Equipment Service Center Manager ("ESCM") Ernie Grimes supervised Mr. Goodman as well as the five other ESC Supervisors at the Indianapolis Service Center. Those five ESC Supervisors and their ages at the time of Mr. Grimes's separation are as follows: Ron Guernsey (61), Ken Thompson (53), Mike Archer (49), Jim Rush (45), and Larry Vankirk (35). At the time he was terminated, Mr. Goodman was 62-years-old and Mr. Grimes was 63.

---

[1] At the time he was first hired, Mr. Goodman worked for Yellow Transportation, Inc., a subsidiary of YRC Worldwide, Inc. In October 2008, YRC Worldwide combined Yellow Transportation and another subsidiary, Roadway Express, Inc., to form Defendant YRC.

**Plaintiff's Health and Medical Procedures**

Mr. Goodman was diagnosed with heart disease, and when he was forty-years-old (before he began his employment with YRC) he underwent open heart surgery. In November 2006, while employed with Defendant, Mr. Goodman was hospitalized for a heart-related episode, specifically, atrial fibrillation ("A-fib"), and, as a result, took leave for a period of time pursuant to the Family Medical Leave Act ("FMLA"). While in the hospital, Mr. Grimes visited him to deliver the FMLA paperwork that had been requested by Mr. Goodman's wife. Some of Mr. Goodman's coworkers also visited him in the hospital.

On November 8, 2006, Mr. Grimes sent an email to his then-managers, Ken Sokol and Mark Cowans, stating: "Gary Goodman was admitted to the hospital yesterday due to heart beat was (sic) 162 beats per minute. They will be running test[s] today. I will let you know what they find. Doctor told his wife it was a good thing he came in because he was at a point of possible stroke or heart attack." Exh. 8. Approximately one week later, on November 13, 2006, Mr. Sokol sent an email to Mr. Cowans, stating:

> I forgot to inform you of this, as of this time Gary [Goodman] has been in the hospital for a week and after test they have determined that he has only 10-15% of his heart functioning. They are doing more tests today (just got canceled don't know why yet) and Ernie [Grimes] will keep me posted. At this time [it is] unknown if Gary will be able to return to IND. Ernie has a total of four supervisors and with Gary in the hospital he is down to three. We may need to look at the possibility of a replacement for Gary if he is unable to return to work.

*Id.*

Despite this seemingly dire prognosis, a few months later, in January 2007, Mr. Goodman returned to work without restrictions. Other than that period of leave in 2006, Mr. Goodman took no other FMLA leaves of absence during his employment with YRC. Mr. Goodman does not allege that he was disciplined or reprimanded in connection with his 2006

3

FMLA leave nor does he allege that any YRC employee ever made negative comments to him about his having taken that leave.

In May 2007, Mr. Goodman had two outpatient cardiac catheterization procedures performed within days of each other and had three stents inserted into his heart. He does not specifically recall informing anyone at YRC about the procedures, but testified by deposition that he may have referred in passing at some point to his "drive through" or "drive by" procedures, although he cannot recall with whom he may have been speaking, when any such conversation occurred, or whether the person was an hourly or management employee. Goodman Dep. at 120; 121-123. Mr. Goodman testified by deposition that, after his procedures in 2006 and 2007, Mr. Grimes "kept a pretty good watch on [him]" and, on a few occasions, told Mr. Goodman to go home because he was "not getting around very good" and "just look[ed] bad." *Id.* at 40.

In 2009, Mr. Goodman had an arterial graft procedure unrelated to his prior heart condition(s) in order to improve blood flow to his legs and was absent from work for a few weeks[2] thereafter. When Mr. Goodman returned to work, he initially experienced difficulty walking and climbing stairs and was restricted from lifting anything weighing over 2.5 pounds. During that time period, Mr. Grimes gave Mr. Goodman permission to park his car directly outside of the shop rather than in the supervisors' parking lot located approximately a quarter mile away. Mr. Goodman contends he was the only ESC Supervisor offered this accommodation, but Mr. Grimes testified by deposition that he himself parked there while recuperating from hernia surgery and that "[a]t least half of the supervisors or more have been able to park there." Grimes Dep. at 66. According to Mr. Goodman, during the first few weeks following his return to work, his co-workers occasionally offered to get him a soft drink, a cup of

---

[2] YRC contends Mr. Goodman was off work for only two weeks following the procedure. Mr. Goodman alleges he remained home for thirty days after the procedure.

coffee, or otherwise offered to assist him, but he believed those offers of help were made out of kindness and a desire to be helpful, not because he was viewed as disabled.  Goodman Dep. at 168-69; 184-89.  Mr. Goodman testified that no one at YRC including Mr. Grimes ever said anything to suggest that they viewed him as disabled as a result of any of his medical procedures. From the time of his return to work in 2009 until his separation in April 2010, Mr. Goodman worked without interruption and was physically able to perform all of his job functions.

Mr. Goodman testified that his current health condition is "poor" and that he takes approximately fourteen medications each day, but he concedes that he has never informed anyone at YRC the purpose of these medications or the nature of these medications, although he alleges that many of his co-workers, including Mr. Grimes, have seen him take them at work. He believes that, despite his health issues, he currently is able to perform his duties as an ESC Supervisor.  Since his separation in 2010, Mr. Goodman has applied for over 200 jobs for which he believes he is qualified and physically able to perform.

**Plaintiff's 2008 and 2009 Performance Rankings**

During Mr. Goodman's tenure as an ESC Supervisor, he and his fellow supervisors were evaluated by Mr. Grimes on several occasions.  In 2008, Mr. Grimes evaluated each ESC Supervisor working under him at the time, giving each a Job Model Score based on his assessment of their performance of various skills organized under two broad categories: competencies and objectives.  In the competencies category, each ESC Supervisor was assigned a numerical rating on each of several sections, including: demonstrates integrity and trust; demonstrates customer focus; demonstrates leadership impact; develops self and others; communicates effectively; drives for results; fosters teamwork and diversity; analysis and sound decision; drives innovation and continuous improvement; and demonstrates technical or

5

functional excellence.  In the objectives category, the ESC Supervisors were rated in various

areas, including: safety performance; service agreements; business plan; employee development;

and mutual respect.  The 2008 Job Model Scores for each supervisor computed were as follows:

| Name: | Competencies: | Objectives: | Total: |
|---|---|---|---|
| Ron Guernsey | 41.00 | 38.89 | 79.89 |
| Jim Rush | 40.00 | 37.78 | 77.78 |
| Gary Goodman | 39.00 | 37.78 | 76.78 |
| Larry Vankirk | 38.00 | 37.78 | 75.78 |
| Daren Archer | 37.00 | 36.67 | 73.67 |

Ken Thompson, who was one of the six ESC Supervisors in 2010 when Mr. Goodman was

terminated, had not yet joined the Indianapolis Supervisory Staff in 2008.

Also in 2008, the ESC Supervisors were ranked according to Skill Rating Forms, which

included scores reflecting the number of years of experience of each supervisor, both in the

industry, and specifically at YRC.  Each ESC Supervisor was assigned a 1 to 5 rating (with 1

being "poor" and 5 being "excellent") in the following six categories: interpersonal

communication; equipment maintenance; management experience/leadership; decisionmaking;

customer focus; and education.  The ratings for the five ESC Supervisors at the Indianapolis

location at the time were computed as follows:

| Name: | Interpersonal Communication: | Equipment Maintenance: | Management Experience: | Decision-making: | Customer Focus: | Education: | Total: |
|---|---|---|---|---|---|---|---|
| Rush | 4 | 5 | 4 | 4 | 4 | 2 | 23 |
| Vankirk | 4 | 4 | 3 | 4 | 3 | 3 | 21 |
| Guernsey | 3 | 4 | 4 | 3 | 3 | 2 | 19 |
| Goodman | 4 | 3 | 3 | 3 | 3 | 2 | 18 |
| Archer | 3 | 3 | 3 | 2 | 3 | 2 | 16 |

As noted above, Mr. Thompson was not yet part of the Indianapolis Supervisory Staff in

2008.

In 2009, all six ESC Supervisors who were working at the Indianapolis Service Center at

the time of Mr. Goodman's termination received performance reviews.  The 2009 performance

reviews included two broad categories: objectives and core behaviors.  The objectives category mirrored that used for the 2008 Job Model Scores, to wit, it included the following sections: safety performance; service agreements; business plan; employee development; and mutual respect.  In the core behavior category, the evaluator was instructed to document "examples where expectations are exceeded or not met," with respect to the following five sections: communication; teamwork; delivers results; customer focus; and manages self and others.  At the end of the 2009 Performance review, each supervisor received an overall rating of: exceeds expectations (3); meets expectations (2); or needs improvement (1).  One supervisor, Jim Rush, received a rating of "exceeds expectations" and one supervisor, Ken Thompson, received a rating of "needs improvement."  The remaining four supervisors, including Mr. Goodman, received the "meets expectations" rating.

Mr. Grimes testified that, beyond the individuals he evaluated, he never shared the 2008 and 2009 performance reviews with anyone else at YRC.  According to Mr. Grimes, he did not share the reviews with the human resources department nor did his immediate supervisor have access to the performance reviews, which were kept in a file cabinet in Mr. Grimes's office.

**Defendant's Reduction-in-Force and Separation of Plaintiff's Employment**

It is undisputed that the economic downturn significantly affected YRC's business.  The company's stock, which once traded at $67.00 per share, sold at approximately $0.59 per share as of April 14, 2010, the date of Mr. Goodman's separation.  Employees have not received pay or salary increases for four years and, in fact, have endured across-the-board pay cuts and frozen 401k and pension benefits.  From January 1, 2009 to November 1, 2011, YSC reduced its non-union workforce by 52% (from 8,278 to 3,972 employees) and its total workforce by 59% (from 36,340 to 21,603 employees).  Since January 1, 2009, the Equipment Services Department

("ESD"), (the department in which Mr. Goodman worked), has suffered a 39% reduction in non-union employees and a total reduction of 75%. As of November 1, 2011, a total of fifty-three employees from the Indianapolis ESD were separated from the company. Forty-nine of those fifty-three employees were younger than Mr. Goodman and eleven were under the age of forty.

There is some dispute between the parties regarding the timing of events leading up to Mr. Goodman's separation. According to YRC, in early March 2010 Senior Manager of Human Resources Jennifer Butler and Mr. Grimes's supervisor, Robert Smith, met with Mr. Grimes to tell him there was a possibility that, as part of the system-wide reduction-in-force ("RIF"), he would be asked to reduce by one the number of ESC Supervisors in the Indianapolis facility and to direct him to tentatively select the one ESC Supervisor for separation. Butler Decl. ¶ 7. Mr. Grimes testified by deposition, however, that he was told by Mr. Smith by telephone of the possibility that the RIF would affect the Indianapolis ESC Supervisors approximately two to four weeks before Mr. Goodman was terminated (somewhere between March 16 and March 31, 2010) and that he was not asked to make a tentative selection of the person to be separated from the company at that time.

YRC contends that, at some point before March 29, 2010, Mr. Grimes used a matrix that was based on a company evaluation form to assess the performance of the Indianapolis ESC Supervisors using the following categories: (1) interpersonal communication; (2) equipment maintenance experience; (3) management experience/leadership; (4) decision-making; (5) customer focus; (6) education/formal education; and (7) PC skills, and created a handwritten spreadsheet ranking the ESC Supervisors in each of these categories on a 1 to 5 scale, 1 being "poor" and 5 being "excellent." According to YRC, after determining that Mr. Goodman received the lowest overall score on the rankings spreadsheet, Mr. Grimes informed Mr. Smith

and Ms. Butler that, if the RIF did in fact extend to the Indianapolis ESC Supervisors, he would tentatively select Mr. Goodman for separation.

On March 29, 2010, Vice President of Maintenance Don Pabst sent an email to his supervisor Ms. Butler and John Sypek containing two possible RIF scenarios.  The first plan, labeled "Plan (a)," contained a list of three names for possible separation.  This list did not include Mr. Goodman.  The alternative plan, labeled "Plan (b)," contained a list of seven names, one of which was Mr. Goodman.  YRC contends that the names on these lists came from the recommendations of the employees' supervisors, including Mr. Grimes.  In the email, Mr. Pabst stated that the preferred plan was Plan (a) and that Plan (b) was not recommended because it "could in fact cause operational issues and … readiness issues."  Exh. K.  However, shortly after this email was sent, YRC determined that, despite Mr. Pabst's recommendation, due to economic reasons it would need to implement Plan (b).

About a week before he made the final separation decision, Mr. Grimes was told that the Indianapolis service center would in fact be affected by the RIF and that one Indianapolis ESC Supervisor would have to be let go.  YRC contends that, at that point, Mr. Grimes inputted into his computer the information he had previously recorded in the handwritten rankings matrix and, based on those scores, selected Mr. Goodman for separation.  Although the typed matrix is signed by Mr. Grimes and dated April 1, 2010, the metadata associated with the document shows that it was not created until April 12, 2010.  Mr. Grimes testified by deposition that he did not decide who was going to be terminated until after he filled out the rankings spreadsheet.  Mr. Grimes then vetted that decision through Human Resources at which point the decision was made final.

On April 14, 2010, Mr. Grimes met with Mr. Goodman to inform him that he had been selected for separation as part of the RIF.  YRC offered Mr. Goodman severance pay in the amount of $7,380.80, which was the maximum offered to employees with ten or more years of service.  All the other employees listed in Plan (b) were also separated from the company.

**Plaintiff's Charge of Discrimination and the Instant Litigation**

On May 7, 2010, Mr. Goodman filed a Charge of Discrimination ("Charge") with the Indianapolis District Office of the Equal Employment Opportunity Commission ("EEOC").  In his Charge, Mr. Goodman alleged that YRC had discriminated against him on the basis of his age and perceived disability.  Mr. Goodman did not specifically include claims of discrimination based on actual disability or a record of disability.  On January 20, 2011, the EEOC issued to Mr. Goodman a Notice of Right to Sue without a determination on the merits.  On April 6, 2011, Mr. Goodman filed his Complaint against YRC alleging discrimination on the basis of age, actual disability, record of disability, and perceived disability.  YRC filed the Motion for Summary Judgment on March 6, 2012, currently before the Court.

<u>**Legal Analysis**</u>

I.     **Motion to Strike**

On May 7, 2012, YRC moved to strike the following seven summary judgment exhibits proffered by Mr. Goodman arguing that they are inadmissible because they are unsworn documents and not attached to a properly authenticated affidavit or otherwise supported by deposition citations or any other admissible evidence already in the record: Exhibit 1 (the 2008 Job Model Scores); Exhibit 2 (July 31, 2008 e-mail from Mr. Grimes); Exhibit 4 (Skills Ratings Forms); Exhibit 5 (2009 Performance Reviews); Exhibit 6 (March 29, 2010 email from Mr.

Pabst to Ms. Butler); Exhibit 7 (March 28, 2012 letter from Frantz Ward to Barry Macy and Quincy Sauer); and Exhibit 9 (metadata provided by YRC for ratings spreadsheet).

It is correct that documents submitted in support of a summary judgment motion must be authenticated in order to be admissible. *See Scott v. Edinburg*, 346 F.3d 752, 759-60 n.7 (7th Cir. 2003). Authentication is proper if the proponent "produce[s] evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Documents produced by an opponent during discovery may be treated as authentic. *In re Greenwood Air Crash*, 924 F. Supp. 1511, 1514 (S.D. Ind. 1995) (Tinder, J.) ("Production of a document by a party [in discovery] constitutes an implicit authentication of that document.") (citations omitted). Here, six of the seven exhibits that YRC seeks to have stricken were, in fact, produced by Defendant pursuant to a discovery request. YRC does not dispute that Exhibits 1, 2, 4, 5, 6, and 9 were among its responses to Mr. Goodman's discovery requests nor does it provide any reason to question the documents' authenticity other than that they are unsupported by an affidavit or deposition testimony. Given these facts, we hold that Exhibits 1, 2, 4, 5, 6, and 9 are implicitly authenticated.

Exhibit 7, the final exhibit YRC requests be stricken, is a letter dated March 28, 2012, which Defendant's counsel reportedly mailed to Plaintiff's counsel. Plaintiff's counsel has represented by declaration that this letter is a true and accurate copy of the letter he received, which sufficiently authenticates the document. Fed. R. Evid. 901(b)(1) (providing that testimony from a witness with knowledge that "an item is what it is claimed to be" satisfies the authentication requirement). Accordingly, we <u>DENY</u> Defendant's Motion to Strike Plaintiff's Exhibits 1-2, 4-7, and 9, submitted in support of his summary judgment response.

YRC also seeks to strike "various complaints and insinuations regarding the discovery process" contained in Plaintiff's response in opposition to summary judgment.  Again, it is correct, as YRC argues, that the time to challenge any lack of production or untimely production of requested discovery is during the discovery period and not in a response to a dispositive motion.  However, because such complaints or insinuations have no bearing on our analysis as set forth in this ruling, they need to be stricken.  Thus, Defendant's motion to strike those comments is also <u>DENIED</u>.

## II.     Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  *See id.* at 255.  However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  The party seeking

summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. *Seener v. Northcentral Technical Coll.*, 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 354 (7th Cir. 1996).  To that end, we carefully review

affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

## III.    Discussion

Mr. Goodman alleges that YRC unlawfully terminated him based on his age or disability. "A party alleging discrimination under the ADA [or] ADEA … may proceed under the direct or indirect method of proof and may rely on circumstantial evidence to meet his burden." *Teruggi v. CIT Group/Capital Finance, Inc.*, ___ F.3d ___, 2013 WL 628324, at *4 (7th Cir. Feb. 21, 2013).  Here, Mr. Goodman has elected to proceed solely via the direct method of proof with circumstantial evidence, and thus, we follow his lead and address only that method.  Under this method of proof, to survive summary judgment on his age and disability discrimination claims Mr. Goodman may offer evidence sufficient to present a "'convincing mosaic' of circumstantial evidence" from which an inference of discriminatory intent can be drawn.  *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)).  Courts in this circuit typically point to the following three categories of circumstantial evidence on which a plaintiff may rely in the employment discrimination context to make such a showing:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Sun v. Bd. of Trustees*, 473 F.3d 799, 812 (7th Cir. 2007) (citation omitted).  Because Mr.

Goodman relies largely on the same circumstantial evidence to support both his age and

disability discrimination claims, we address these claims together.[3]

    The primary thrust of Mr. Goodman's argument is that Mr. Grimes was instructed by

someone in YRC management to choose Mr. Goodman for separation on the basis of his age and

disability.  In support of this theory, Mr. Goodman relies largely upon Mr. Grimes's testimony

that he selected Mr. Goodman for separation only after he received final confirmation in early

April that one Indianapolis supervisor would need to be included in the RIF.  Mr. Goodman

argues that this contradicts the testimony of Ms. Butler and Mr. Pabst that Mr. Goodman's

inclusion in Mr. Pabst's March 29, 2012 email on the list of employees who would be separated

if the company followed Plan (b) was based on Mr. Grimes's preliminary recommendation.

However, even viewing the facts in a light most favorable to Mr. Goodman, as we are required to

do at this stage in the litigation, it is clear that he has failed to meet his burden under the direct

method of proof.

    Assuming that Mr. Grimes had not provided Mr. Goodman's name as his tentative choice

for separation before Mr. Pabst sent his March 29, 2010 email listing Mr. Goodman as one of the

employees who would be separated under Plan (b) as alleged by YRC, there still is no evidence

that Mr. Goodman's inclusion on that list was based on his age or disability as opposed to any

other nondiscriminatory reason.  Mr. Goodman concedes that no one at YRC ever uttered any

direct comments about his age or disability nor is there evidence in the record establishing that

Mr. Pabst was aware that Mr. Goodman was the oldest of the Indianapolis supervisors, that he

---

[3] Because we find that Plaintiff has failed to meet his burden of presenting sufficient evidence to raise an inference
of discrimination, we need not address Defendants' other arguments in support of summary judgment, to wit, that
Mr. Goodman failed to establish that he is disabled under the ADA and its amendments and that he failed to exhaust
his administrative remedies as to his claims based on an actual disability and/or a record of disability.

had turned sixty-two years of age shortly before being separated from the company, or that Mr. Pabst had knowledge of Mr. Goodman's prior medical history.[4]  Moreover, it is undisputed that Mr. Pabst had recommended that YRC *not follow* the Plan (b) option, and thus, *not* terminate Mr. Goodman.  Mr. Goodman does not allege that YRC's subsequent determination contrary to Mr. Pabst's recommendation otherwise, and based on the company's economic situation, requiring the more drastic cuts set forth in Plan (b), was suspect or discriminatory.  In short, there is simply nothing about Mr. Goodman's inclusion on the list set out in Mr. Pabst's email that directly supports an inference of a discriminatory motive for his termination.

Mr. Goodman also contends that the evidence shows that the ranking spreadsheet created by Mr. Grimes was merely a pretext for discrimination.  According to Mr. Goodman, the rankings spreadsheet is "suspicious on its face" because, with "one exception," the rankings correspond to the employees' ages, and, although it is signed by Mr. Grimes and dated April 1, 2010, the associated metadata indicates that the document was not created until April 12, 2010.  However, that "one exception" alone defeats Mr. Goodman's contention that the rankings correspond to the supervisors' ages.  Nor does the fact that the spreadsheet was apparently misdated raise an inference of discrimination.  There is no indication that the error with regard to the date was anything other than an innocent mistake by Mr. Grimes.  Even if the spreadsheet was first inputted into the computer on April 12, 2010, it was indisputably created before April 14, 2010, the date when Mr. Goodman was terminated.

Mr. Goodman further argues that the rankings spreadsheet also evidences pretext because the rankings are inconsistent with prior performance reviews and the replacement of "years of experience" with "PC skills" in the assessment rubric favors younger workers.  However, as the

---

[4] Plaintiff has submitted evidence of November 2006 emails between Mr. Grimes and his then-supervisors, Mr. Sokol and Mr. Cowans, discussing Mr. Goodman's health condition at that time.  However, there is no evidence that Mr. Pabst had been made aware of these facts or had independent knowledge of Mr. Goodman's medical history.

Seventh Circuit has recognized, "[T]here is certainly nothing inherently discriminatory about an employer's decision to use criteria other than past performance evaluations to determine whether its employees can meet the increased workplace expectations that often coincide with a corporate reorganization."  *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1065 (7th Cir. 2003) (citation omitted).  Here, Mr. Grimes testified by declaration that he included the categories on the ranking spreadsheet that he believed "were most important to help the Indy Service Center survive during these very challenging times."  Grimes Decl. ¶ 11.  According to Mr. Grimes, because YRC's equipment is primarily electronic, ESC Supervisors must be proficient with computers, and Mr. Goodman "was not at all proficient with Microsoft [O]ffice, [W]ord, [E]xcel, [O]utlook and some of the other computer programs used by the Indy Service Center on a regular basis, and he was not able to grasp or retain computer concepts and procedures as quickly as the other ESC Supervisors."  *Id.* ¶ 13.  Mr. Goodman has failed to designate evidence sufficient to call into question either Mr. Grimes's determination that it was necessary for ESC Supervisors to be proficient with computers and electronics or the accuracy or legitimacy of his assessment of Mr. Goodman's computer skills.  In fact, Mr. Goodman himself has acknowledged that he has only "basic" or "minimal" computer skills.  Goodman Dep. at 101.

Moreover, although Mr. Grimes did replace "years of experience" with "PC skills" in the rubric, which Mr. Goodman contends predisposed older employees to unfair treatment, Mr. Grimes did not thereby eliminate consideration of the Indianapolis ESC Supervisors' experience altogether.  Instead, Mr. Grimes considered both the equipment maintenance and management experience of the ESC supervisors when making his selection determination.[5]  He testified that he viewed these categories to be more relevant than considering years in the position because a

---

[5] We also note that all of the Indianapolis ESC Supervisors had multiple years of experience and certain had more years of experience than Mr. Goodman.

longer tenure does not necessarily equate to an increased skill level.  Mr. Goodman has not

refuted or otherwise challenged that testimony or argued that it evidences discrimination.

Finally, Mr. Goodman references two statements allegedly made by Mr. Grimes around

the time of his termination that he characterizes as suspicious.  First, he contends that shortly

before he was terminated Mr. Grimes told him "that upper management had inquired about him

and Mr. Grimes had responded that 'Goodman is one of the best supervisors I've got.'"  Pl.'s Br.

at 26.  Assuming that Mr. Grimes did in fact make this statement, there is nothing discriminatory

or suspicious about it.  It is undisputed that Mr. Goodman was indeed a good supervisor and that

Mr. Grimes would "hire him again today if [he] could."  Grimes Dep. at 129.  It is not inherently

contradictory for Mr. Grimes to believe Mr. Goodman to be an "excellent worker" while at the

same time viewing him as "the weakest [supervisor] at the time" when he was required to make

the termination decision.  *Id.*  We simply cannot conclude from this statement that any inference

of discriminatory intent is established.

Mr. Goodman also claims that after informing him of his termination Mr. Grimes

instructed him not to sign the severance papers, stating, "Had this happened two weeks earlier,

you might not have been the one to go."  *Id.*  First, the evidence shows that YRC uniformly

advised each of its separated employees to refrain from signing their severance papers until they

had taken them home and carefully reviewed them, either with or without the help of an attorney.

Nothing about this advice raises an inference of discrimination.  Nor can we conclude that Mr.

Grimes's comment, without more, is age-related.  *See Schaffner v. Glencoe Park Dist.*, 256 F.3d

616, 622-23 (7th Cir. 2001).  Mr. Goodman contends that it is related to his age because he

turned sixty-two on April 4, 2010, ten days prior to his termination.  However, Mr. Goodman

also testified that he does not know what Mr. Grimes meant by the alleged statement and that no

18

one at YRC had ever made any ageist comments to him.  Goodman Dep. at 244; 335-36.  Nor is

Goodman aware of whether Mr. Grimes actually knew it was his birthday.  *Id.* at 326-27.

Moreover, it is undisputed that Mr. Grimes was aware that two weeks prior to Mr. Goodman's

termination, YRC was still exploring whether the RIF would extend to the Indianapolis ESC

Supervisors; obviously had it not, Mr. Goodman would not have been terminated.  Given these

facts, we are not persuaded that this statement, considered alone or in combination with the other

evidence presented by Mr. Goodman, is sufficient to raise an inference of unlawful intent.

 In short, none of the evidence identified by Mr. Goodman either alone or in combination

raises an inference of discrimination nor does it create a "convincing mosaic" of circumstantial

evidence sufficient to survive summary judgment.  It is undisputed that Mr. Goodman was a

hardworking, valued employee at YRC who we are certain would not have been terminated

under normal circumstances.  But this does not mean that his termination as part of a RIF was

discriminatory.  As the Seventh Circuit has recognized, "[i]n a reduction in force, someone has to

go."  *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 573 (7th Cir. 1998).  Mr. Goodman has

simply failed to produce sufficient evidence under the direct method of proof to establish that he

was let go because of discriminatory animus on the part of YRC.

## IV. Conclusion

 For the foregoing reasons, we <u>DENY</u> Defendant's Motion to Strike and <u>GRANT</u>

Defendant's Motion for Summary Judgment.  Final judgment shall be entered accordingly.

 IT IS SO ORDERED.

Date: _____03/19/2013_____

           *Sarah Evans Barker*

           SARAH EVANS BARKER, JUDGE
           United States District Court
           Southern District of Indiana

19

Distribution:


Michael P. Palmer
BARNES & THORNBURG - South Bend
mpalmer@btlaw.com

Peter Thomas Tschanz
BARNES & THORNBURG LLP
peter.tschanz@btlaw.com

Michael N. Chesney
FRANTZ WARD, LLP
mchesney@frantzward.com

Quincy Erica Sauer
MACEY SWANSON & ALLMAN
qsauer@maceylaw.com

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com